**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Zafar Mehmood,<br><br>Defendant.<br>______________________________/ | Case No. 12-cr-20042 & 14-cr-20515<br><br>(Related Case Nos. 22-cv-13089 & 22-cv-13090)<br><br>Judith E. Levy<br>United States District Judge |

**OPINION AND ORDER DENYING DEFENDANT'S MOTION TO VACATE SENTENCE UNDER 28 U.S.C. § 2255 [434]**

Defendant Zafar Mehmood was sentenced by this Court to 300 months of imprisonment after a jury convicted him of healthcare fraud, money laundering, and obstructing justice (among other offenses). Before the Court is Defendant's motion to vacate his sentence under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), as codified at 28 U.S.C. § 2255. (ECF No. 434.)[1] Because Mehmood seeks relief under § 2255, this opinion generally refers to him as the Petitioner.

---

[1] The criminal charges against Mehmood were brought in two separate indictments filed in two separate dockets (No. 12-cr-20042 and No. 14-cr-20515). Despite being indicted separately, the charges were tried jointly and resulted in a

For the reasons set forth below, Petitioner's motion is denied.

## I. Background

### A. Indictment and Conviction on Charges Related to Medicare Fraud

"From 2006 until 2011, [Petitioner], [his co-defendant Badar] Ahmadani, and others ran a number of home-health-care companies that purported to provide physical therapy to home-bound Michigan beneficiaries." *United States v. Mehmood*, 742 F. App'x 928, 931 (6th Cir. 2018) (call number omitted) (hereinafter "*Mehmood I*"). "In reality, the companies were engaged in a scheme to defraud Medicare." *Id.* "The government presented evidence that Defendants and their co-

---

single sentence of imprisonment. (*See* ECF No. 208 (verdict form); ECF No. 285 (initial judgment dated November 16, 2016); ECF No. 419 (amended judgment dated June 3, 2019).) Petitioner's § 2255 petition was filed in a new civil matter (*see* Petition for Writ of Habeas Corpus, *Mehmood v. United States*, No. 22-cv-12937 (E.D. Mich. Dec. 5, 2022), ECF No. 1) before being docketed in both criminal cases by the court clerk. *See* Petition for Writ of Habeas Corpus, *United States v. Mehmood*, No. 12-cr-20042 (E.D. Mich. Dec. 14, 2022), ECF No. 434; Petition for Writ of Habeas Corpus, *United States v. Mehmood*, No. 14-cr-20515 (E.D. Mich. Dec. 14, 2022), ECF No. 118. Although the petition was docketed in both criminal cases, the government's response to the petition (ECF No. 442) and Mehmood's reply (ECF No. 445) were filed solely in Case No. 12-20042. ***To streamline this opinion and avoid confusion, the Court will cite docket entry numbers (e.g., ECF No. 434) and PageID numbers for Case No. 12-cr-20042 and will not include parallel citations to identical documents that were docketed in Case No. 14-cr-20515.*** If a document was filed solely in Case No. 14-cr-20515, the Court will make that clear when citing the document.

conspirators hired and paid recruiters to use bribes . . . to induce Medicare-eligible persons to sign up for in-home physical therapy services with Defendants' companies." *Id.* "Defendants and their employees then created fake patient records with fabricated medical information to make it appear as if the patients needed and received physical therapy." *Id.* "The companies then submitted claims to Medicare for health-care services that were either not provided to the beneficiaries or were not medically necessary." *Id.* "In total, Defendants' companies submitted $47,219,535.47 in Medicare claims and Medicare paid $40,488,106.98 on those claims." *Id.*

After becoming aware of this scheme, the government obtained a warrant to search Petitioner's business office at 850 South Hewitt Road in Ypsilanti, Michigan. (*See, e.g.*, ECF No. 322, PageID.9208–9209.) Agents took photographs and seized documents while searching the premises in November 2011. (*See, e.g.*, ECF No. 322, PageID.9209, PageID.9212.)

In January 2012, a grand jury in the Eastern District of Michigan returned an indictment that charged Petitioner with four counts of healthcare fraud in violation of 18 U.S.C. § 1347 and § 2, one count of

conspiring to commit healthcare fraud in violation of 18 U.S.C. § 1349, one count of conspiring to pay and receive healthcare kickbacks in violation of 18 U.S.C. § 371, two counts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and § 2, and one count of conspiring to launder money in violation of 18 U.S.C. § 1956(h). (ECF No. 25.)[2]

These charges and the separate obstruction charges addressed below were tried before a jury over several weeks in July 2015. At the conclusion of the trial, a jury found Petitioner guilty of all charges. (*See* ECF No. 208.)

### B. Indictment and Conviction on Obstruction Charges

Petitioner was detained by Court order prior to his trial due to concerns that he might otherwise flee to his home country of Pakistan. (*See* ECF No. 24.) But the Court granted Petitioner's motion to be released temporarily so that he could review evidence stored at the Detroit field office of the Office of the Inspector General for the United States Department of Health and Human Services (referred to herein as the "HHS OIG field office"). (*See* ECF No. 144.)

---

[2] Charges were brought against additional defendants in a First Superseding Indictment returned in April 2012, but the charges against Petitioner remained unchanged. (*See* ECF No. 42.)

Petitioner and his counsel reviewed documents at the HHS OIG field office over the course of three days in July 2014. (*See, e.g.*, ECF No. 155, PageID.1301.) Shortly thereafter, federal agents determined that certain documents were missing from the files pertaining to Petitioner's case that were stored at the HHS OIG field office. (*See id.* at PageID.1302.) The agents obtained a search warrant that permitted them to search Petitioner's jail cell for the missing records. (*See id.*) The government asserted that it recovered the missing files from Petitioner's cell as part of this investigation. (*See id.*)

In August 2014, a grand jury in the Eastern District of Michigan returned an indictment in Case No. 14-cr-20515 that charged Petitioner with two counts of obstructing justice in violation of 18 U.S.C. § 1512 and § 2. (*See* Case No. 14-cr-20515, ECF No. 1.) The charges were based on Petitioner's alleged theft of documents during his July 2014 visit to the HHS OIG field office.

The attorneys who accompanied Petitioner on the July 2014 visit to the HHS OIG field office (Martin Crandall and Glenn Ross) withdrew from representing Petitioner after he was charged with obstruction. (*See* ECF No. 155, PageID.1302; *see also* ECF No. 156.) The Court appointed

attorney John Minock to represent Petitioner in their stead. (*See* ECF Nos. 157, 158.) Petitioner separately retained attorney Khalid Kahloon to serve as part of his defense team at his 2015 trial. (*See* ECF No. 165.)

At Petitioner's trial, federal agents testified regarding Petitioner's on-site review of original patient files at the HHS OIG field office; the discovery that portions of several patient files were missing following this review; the execution of a warrant to search Petitioner's cell for the missing documents; and the discovery of documents in Petitioner's cell that appeared to be originals and that matched the pages that were known to be missing following the review.

The government also used documentary evidence to support its claim that Petitioner stole documents during his visit to the HHS OIG field office in 2014. The government introduced Exhibit 351 into evidence, which it characterized as a copy of a "Janie Drake" patient file that was seized from Petitioner's office in 2011 and later scanned into a digital format prior to Petitioner's July 2014 site visit to the HHS OIG field office.[3] (ECF No. 322, PageID.9330.) Defense counsel objected and argued

[3] A federal agent confirmed at trial the Janie Drake patient file was the only allegedly stolen file that was scanned prior to Petitioner's July 2014 document review. (*See* ECF No. 324, PageID.9570, PageID.9602–9603.)

forcefully at sidebar that Exhibit 351 had not been properly authenticated given the testifying agent's inability to confirm when it was scanned into a digital format and by whom. (*See id.* at PageID.9331–9344.) The Court overruled counsel's objection and admitted Exhibit 351 into evidence. (*See id.* at PageID.9340–9341, PageID.9344.)

The government also relied on Exhibit 352, which it characterized as what remained in the Janie Drake patient file after it was reviewed by Petitioner and his counsel at the HHS OIG field office in July 2014. (ECF No. 324, PageID.9590–9591, PageID.9632.)

Finally, the government introduced Exhibit 350A, which were pages pertaining to Janie Drake that were recovered from Petitioner's cell following the execution of the search warrant. (*See* ECF No. 324, PageID.9560–9561.) The jury heard evidence suggesting that the pages of the Janie Drake file that were recovered from Petitioner's cell were among the most damaging to Petitioner's defense, because they concerned instances in which Petitioner's companies billed Medicare for treatment on dates in which the patient (Janie Drake) was hospitalized and thus could not have received in-home physical therapy. (ECF No. 324, PageID.9618; *see also* ECF No. 327, PageID.10326–10328.) The jury

also heard testimony that the "Janie Drake" documents found in Petitioner's cell were stored in a manila envelope (i.e., Exhibit 350) on which someone had written "HH office." (*See* ECF No. 323, PageID.9504, PageID.9507–9508; ECF No. 324, PageID.9559–9560.)

The government explained to the jury during its closing argument that, if you compared Exhibits 351, 352, and 350A, you could see that the pages recovered from Petitioner's cell (Exhibit 350A) plus the pages that remained at the HHS OIG field office following the review (Exhibit 352) "match exactly" to the pages comprising the original, pre-review patient file (Exhibit 351). (ECF No. 327, PageID.10327.)

Because there could be no dispute that pages from patient files were found in Petitioner's cell following a search, Petitioner's trial counsel sought to cast doubt on the government's theory that Petitioner stole these pages from the HHS OIG field office. Petitioner's trial counsel called one of Petitioner's former attorneys (Abdul Ghuman) who testified in Petitioner's defense that (1) copies of many patient files remained in Petitioner's business office following the government's 2011 search and (2) he regularly brought Petitioner copies of documents from this office over the course of 2014. (ECF No. 324, PageID.9738–9740.) Defense

counsel also elicited testimony from the agent who executed the search warrant in July 2014 that Petitioner possessed many papers in his cell that were not responsive to the warrant and that were thus left behind. (*Id.* at PageID.9546–9549.) Counsel also called as witnesses the two attorneys who accompanied Petitioner to the HHS OIG field office, both of whom denied seeing Petitioner take anything out of the facility but acknowledged on cross-examination that it was possible that Petitioner took documents when they were not looking or when they stepped out of the room briefly. (*Id.* at PageID.9725, PageID.9728, PageID.9734, 9736.) In his closing argument, Petitioner's counsel asked the jury to use their "simple common sense" and to question why Petitioner would risk stealing documents when he already had access to copies of the relevant files. (*See* ECF No. 327, PageID.10360–10361.)

Despite these efforts, the jury found Petitioner guilty of obstructing justice and thus concluded beyond a reasonable doubt that he obstructed justice when he stole files from the HHS OIG field office. (*See* ECF No. 208.)

### C. Initial Sentencing and Appeal

Petitioner represented himself at an October 2016 sentencing hearing with Mr. Minock serving as standby counsel. (*See* ECF No. 279, PageID.5152–5153.) As part of the hearing, the Court computed an advisory sentencing range of 175 years under the federal sentencing guidelines based on an offense level of 43 and a criminal history category of I. (*Id.* at PageID.5227.) The Court explained at the hearing that it would treat the entire amount that Petitioner's companies billed to Medicare between 2006 and 2011 ($47,219,535.47) as the relevant "loss" for determining the size of the applicable fraud enhancement under U.S.S.G. § 2B1.1(b)(1). (*See id.* at PageID.5163–5164.) The Court accepted the government's argument that the entire amount billed could be treated as fraudulent because Petitioner obtained access to the Medicare program by promising falsely that he would not engage in kickbacks. (*See id.*) At the conclusion of the hearing, the Court imposed a sentence of 360 months (i.e., 30 years) of imprisonment. (*See id.* at PageID.5253; *see also* ECF No. 285 (judgment).)

Petitioner filed a timely appeal. In a decision issued on July 13, 2018, the Sixth Circuit affirmed Petitioner's conviction but vacated his

360-month sentence due to issues with the calculation of Petitioner's offense level under the sentencing guidelines. *See Mehmood I*, 742 F. App'x at 934–43. Among other things, the Sixth Circuit disagreed with the approach of treating the entire amount Petitioner billed to Medicare as fraudulent based on Petitioner's false statements when he first applied for certification. *See id.* at 939–41.

**D. Re-Sentencing and Second Appeal**

On remand, the Court held two days of hearings regarding the imposition of a new sentence and a new motion filed by Petitioner that sought a new trial based on a newly obtained forensic analysis of certain exhibits that were presented by trial. (*See* ECF Nos. 417, 423 (hearing transcripts).) Petitioner was represented by a new attorney, James Lawrence. As described in more detail below, Mr. Lawrence called seven witnesses who testified regarding their former employment by Petitioner's companies at various times between 2006 and 2011. (*See* ECF No. 417, PageID.12198–12237; ECF No. 423, PageID.12281–12305.) Relying on testimony provided by some of these witnesses along with other evidence presented at trial, the Court determined that 80% of certain companies' Medicare billings should be treated as fraudulent for

purposes of computing the loss amount to be used to determine the relevant offense level under § 2B1.1(b) of the advisory sentencing guidelines. (*See* ECF No. 423, PageID.12362–12365.)

Based on this adjustment (among others), the Court determined that the relevant guidelines range was 360 months to life based on a criminal history category of I and an offense level of 42. (*See id.* at PageID.12366.) The Court re-sentenced Petitioner to 300 months (i.e., 25 years) of imprisonment based on its recalculation of the relevant guidelines range and its reconsideration of the 18 U.S.C. § 3553(a) factors. (*See id.* at PageID.12381; ECF No. 419 (amended judgment).)

Petitioner timely appealed the amended judgment. (ECF No. 420.) In an opinion issued on July 15, 2021, the Sixth Circuit rejected all of Petitioner's arguments and affirmed the imposition of a 300-month sentence. *See United States v. Mehmood*, Nos. 19-1243, 19-1667, 19-1669, 2021 WL 2979591 (6th Cir. July 15, 2021) (hereinafter "*Mehmood II*").

**E. Petitioner's § 2255 Motion**

On December 5, 2022, Petitioner filed a motion for post-conviction relief under 28 U.S.C. § 2255. (ECF No. 434.) *See also* Petition for Writ of Habeas Corpus, *Mehmood v. United States*, No. 22-cv-12937 (E.D. Mich.

Dec. 5, 2022), ECF No. 1. Petitioner's § 2255 motion is fully briefed. (ECF Nos. 442, 445.)

## II. Timeliness

The Court first addresses the timeliness of Petitioner's motion. 28 U.S.C. § 2255(f), which sets forth the period of limitations for such a motion, states:

> A 1-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of—
>
> > (1) the date on which the judgment of conviction becomes final;
> >
> > (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;
> >
> > (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
> >
> > (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255(f).

Petitioner was re-sentenced by this Court on May 29, 2019. (*See* ECF No. 423 (transcript).) The Court entered an amended judgment

against Petitioner on June 3, 2019. (*See* ECF No. 419.) The United States Court of Appeals for the Sixth Circuit affirmed Petitioner's sentence in a decision issued on July 15, 2021. (ECF No. 432.)

Because Petitioner did not thereafter petition the Supreme Court for certiorari, the judgment against him became final on the last day on which a petition for certiorari could have been filed. *See Kemp v. United States*, 596 U.S. 528, 531 (2022); *Clay v. United States*, 537 U.S., 522, 527 (2003). Through a series of orders issued in connection with the COVID-19 pandemic, the Supreme Court effectively set the deadline for Petitioner to petition for certiorari at 150 days (as opposed to the usual 90 days) after the Sixth Circuit issued its decision. *Compare, e.g.*, Miscellaneous Order Rescinding COVID-19 Related Orders, 338 F.R.D. 801 (July 19, 2021), *with* Sup. Ct. R. 13.1 (setting deadline of "90 days after entry of the judgment" to petition for certiorari). Based on these orders, the judgment against Petitioner became final on December 13, 2021.[4] The limitations period for Petitioner's § 2255 petition therefore expired on December 13, 2022. *See* 28 U.S.C. § 2255(f)(1).

[4] Because the 150th day after the Sixth Circuit issued its decision (December 12, 2021) fell on a Sunday, a petition for certiorari would have been due on the next business day, which was Monday, December 13, 2021. *See* Sup. Ct. R. 30.1.

Petitioner filed his petition with this Court on December 5, 2022. *See* Petition for Writ of Habeas Corpus, *Mehmood v. United States*, No. 22-cv-12937 (E.D. Mich. Dec. 5, 2022), ECF No. 1. The petition is therefore timely.[5]

## III. Legal Standards

An inmate in federal custody who files a motion to "vacate, set aside, or correct [his] sentence" under AEDPA must demonstrate "that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such

---

[5] Petitioner's § 2255 petition (ECF No. 434) was filed by a California attorney who has since withdrawn from the case. (*See* ECF No. 447.) The petition asserts that the judgment against Petitioner "became final on October 13, 2021, when the time for filing a petition of certiorari elapsed." (ECF No. 434, PageID.12550–12551.) It does not reference the Supreme Court orders that temporarily extended the deadline for Petitioner to seek certiorari from October 13, 2021 until December 13, 2021. The petition also suggests that October 13, 2022 (as opposed to December 13, 2022) was the applicable deadline to seek relief. (*See id.* at PageID.12551 (asserting that "Petitioner timely files the instant petition *before October 13, 2022*" (emphasis added)).) After reviewing this aspect of the petition, the Court appointed counsel to represent Petitioner (ECF No. 448) and, on July 8, 2026, ordered Petitioner to show cause why his petition (which was filed on December 5, 2022) should not be dismissed as untimely. (ECF No. 449.) Petitioner's newly appointed counsel, Benton Martin, responded to the show-cause order and noted that Petitioner's deadline to move for relief under § 2255 was extended by the COVID-19-related Supreme Court orders addressed above. (*See* ECF No. 451, PageID.12794.) The Court thanks Mr. Martin for his service and for providing this clarification.

a sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a).

"A motion brought under § 2255 must allege one of three bases as a threshold standard: (1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid." *Weinberger v. United States*, 268 F.3d 346, 351 (6th Cir. 2001) (citing *United States v. Addonizio*, 442 U.S. 178, 185–86 (1979)).

Constitutionally ineffective representation may provide a basis for relief under § 2255. *See Short v. United States*, 471 F.3d 686, 692 (6th Cir. 2006). A petitioner who seeks relief based on alleged ineffective assistance of counsel must satisfy the two-pronged standard established in *Strickland v. Washington*, 466 U.S. 668 (1984).[6] The petitioner "must demonstrate (1) that counsel's representation fell below an objective standard of reasonableness and (2) that a reasonable probability exists

---

[6] The Court relies in part on opinions that address ineffective-assistance arguments brought under 28 U.S.C. § 2254 because their reasoning is equally applicable to ineffective-assistance arguments brought under 28 U.S.C. § 2255. *See United States v. Conley*, 290 F. Supp. 3d 647, n.18 (E.D. Ky. 2017) (explaining that the reasoning set forth in § 2254 cases "also appl[ies] to a § 2255 *Strickland* theory" (citing *Winkler v. United States*, No. 3:08-cr-014, 3:10-cv-210, 2013 WL 4494971, at *2 (E.D. Tenn. Aug. 20, 2013))).

that, but for his attorney's unprofessional representation, the result of the proceeding would have been different." *Snider v. United States*, 908 F.3d 183, 192 (6th Cir. 2018) (citing *Strickland*, 466 U.S. at 687–88). "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011) (citing *Strickland*, 466 U.S. at 693).

When conducting this inquiry, "a court must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. "The Sixth Amendment 'does not guarantee perfect representation' but only 'reasonably competent' representation." *Moody v. United States*, 958 F.3d 485, 492 (6th Cir. 2020) (quoting *Harrington*, 562 U.S. at 110). An attorney's "decisions only become deficient—that is, incompetent—when no reasonable counsel would have made the same choice at the time." *Id.* (citing *Strickland*, 466 U.S. at 690). "'The test for ineffectiveness is not whether counsel could have done more;' it is merely whether counsel did enough." *Neuhard v. United States*, 119 F.4th 1064, 1070 (6th Cir. 2024) (quoting *Waters v. Thomas*, 46 F.3d 1506, 1518 (11th Cir. 1995)), *cert. denied*, 145 S. Ct. 1975 (2025).

In reviewing a petition filed under § 2255, a court must hold an evidentiary hearing if "a genuine dispute of fact exists" concerning a "'legally important fact.'" *Carson v. United States*, 88 F.4th 633, 642 (6th Cir. 2023) (quoting *Wallace v. United States*, 43 F.4th 595, 607 (6th Cir. 2022)). "If a claim would fail even if a court construed the disputed fact in the [petitioner's] favor, the court need not hold a hearing." *Id.* (citing *Wallace*, 43 F.4th at 607). An evidentiary hearing is thus not required if "the record conclusively shows that the petitioner is entitled to no relief." *Arredondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999) (quoting *Blanton v. United States*, 94 F.3d 227, 235 (6th Cir. 1996)). A hearing is also not required where the petitioner's allegations are "inherently incredible, or conclusions rather than statements of fact." *Id.* (quoting *Engelen v. United States*, 68 F.3d 238, 240 (8th Cir. 1995)). To obtain an evidentiary hearing, a petitioner who claims he received ineffective assistance of counsel must thus "show that he has presented facts that would support his position with respect to each of [*Strickland*'s] two prongs and that the record does not refute those facts." *Beemath v. United States*, No. 24-2115, 2026 WL 2350298, at *5 (6th Cir. Aug. 13, 2026).

## IV. Analysis

Petitioner argues that he is entitled to relief under 28 U.S.C. § 2255 because he was denied effective representation by counsel at trial and at sentencing. He contends that his counsel was constitutionally ineffective in five ways:

1. Trial counsel allegedly failed to adequately investigate and present evidence that Petitioner appears to believe would have prevented him from being convicted for obstructing justice;

2. Trial counsel was allegedly deficient in failing to raise certain objections in connection with the Court's decision to proceed without an interpreter for a portion of the trial;

3. The attorney who represented Petitioner at his re-sentencing in 2019 allegedly failed to adequately investigate and introduce evidence of legitimate billings that might have resulted in a lower offense level and, thus, may have provided a lower range of potential sentences under the advisory guidelines;

4. Counsel did not call a witness to testify about his alleged role in organizing aspects of Petitioner's office prior to the government's execution of a search warrant in November 2011; and

5. Counsel allegedly failed to "investigate and argue the 18 U.S.C. § 3553(a) factors" at Petitioner's re-sentencing in 2019.

Each of these arguments is addressed below. For the reasons set forth below, each of these arguments fails.

### A. Evidence to Counter Obstruction-of-Justice Charges

Petitioner first contends that his sentence should be vacated due to his lawyers' alleged failure to investigate and present certain evidence at trial that he believes would have established that he did not steal files during a July 2014 visit to the HHS OIG field office. (*See* ECF No. 434, PageID.12553–12563; ECF No. 445, PageID.12735–12738.) Petitioner raises three arguments related to how his attorneys provided constitutionally ineffective counsel in defending him against the obstruction charges. Petitioner first argues that his trial counsel failed to obtain evidence that he claims would have demonstrated that he and his prior counsel did not review the allegedly stolen files at the HHS OIG field office. Petitioner next argues that his trial counsel was ineffective in allegedly failing to retain and present photographs that he believes would have shown that the patient files that were seized from his cell were "leftover files" that his former attorney took from Petitioner's business office. (ECF No. 434-1, PageID.12591.) Petitioner finally argues that, despite agreeing to do so, his trial counsel failed to engage an expert to conduct a forensic comparison of versions of the "Janie Drake" patient file that the government later used to prove its obstruction case.

Each of these arguments fails for the reasons set forth below.

*i.* *Evidence of What Petitioner Reviewed at the HHS OIG Field Office in July 2014*

Petitioner argues that his trial attorneys were ineffective in failing to secure and introduce evidence that would allegedly demonstrate that the patient files that the FBI determined to be missing following his July 2014 visit to the HHS OIG field office were not among the files he reviewed during that visit. (*See* ECF No. 434, PageID.12555–12557; ECF No. 434-1, PageID.12590–12591.) This argument does not provide a viable basis to find Petitioner's counsel constitutionally ineffective.

Petitioner asserts that notes taken by the two attorneys who accompanied him to the HHS OIG field office "did not reference the patient's medical records that the FBI seized from my cell." (ECF No. 434-1, PageID.12591.) But the only evidence he offers to support this assertion is his own recollection of a conversation in which Mr. Crandall allegedly said that "his notes did not indicate that we had reviewed the allegedly stolen files." (*Id.* at PageID.12590.) Assuming that Petitioner's recollection of this conversation is correct, his former attorney's hearsay statement does not help Petitioner establish that subsequent counsel provided ineffective representation in allegedly failing to secure and use

these notes at trial. Mr. Crandall testified at trial and was specifically asked by Petitioner's counsel if he took any notes during the visits to the HHS OIG field office in July 2014. (*See* ECF No. 324, PageID.9724.) Mr. Crandall responded that he "made scant notes" because his role was "getting the boxes coming in" and "divvying them up amongst the people that were working with me and kind of being the team leader on the project." (*Id.*) Mr. Crandall's testimony that he took only "scant" notes means that these notes could not have established definitively what was and was not reviewed by Petitioner and his counsel.

Petitioner asserts that his other attorney, Mr. Ross, "also took notes and used his phone to take photographs of the pages of patient files we reviewed." (ECF No. 434-1, PageID.12590.) Petitioner's declaration provides no support for his apparent belief that Mr. Ross's notes "did not reference the patient's medical records that the FBI seized from my cell" or his belief that Mr. Ross's photographs "depicted none of the patient's medical files which the FBI seized from my cell." (*Id.* at PageID.12591.) Petitioner provides no explanation for how he purportedly knows what photographs or notes taken by Mr. Ross would show.

In any event, even if Mr. Ross's notes and photographs did not, in fact, mention or depict the files that later went missing, this would do little to cast doubt on whether Petitioner and his attorneys in fact reviewed those files during their visit to the HHS OIG field office. Mr. Ross was called by the defense team and testified at trial regarding the review of documents in July 2014. (*See* ECF No. 324, PageID.9731–9733.) As part of this testimony, Mr. Ross was not asked about and did not mention any notes or photographs he may or may not have taken. He was, however, asked about the process for obtaining copies of documents that were reviewed by Petitioner and his defense team. (*See id.* at PageID.9732–9733.) Mr. Ross testified that his team was able to ask federal agents to photocopy "an occasional five or ten pages here or there throughout the day." (*Id.*) He also described "the plan" for obtaining copies of larger swaths of documents as "to kind of tab certain documents that we wanted copies of, and I think we would presumably have brought in a vendor . . . to image certain sets of the documents." (*Id.* at PageID.9733.) This testimony indicates that Mr. Ross did not create an exhaustive inventory of every page that the team reviewed either through note-taking or photographs.

In addition, even if they had been collected and introduced at trial, any notes or photographs taken by Petitioner's former attorneys would need to be weighed against the government's evidence regarding what was reviewed during the July 2014 site visit. Special Agent James Grzeszczak (who worked out of the HHS OIG field office and who was present for the July 2014 review) testified that "[w]e were taking continuous notes" regarding "what was being brought out [for Petitioner and his counsel to review] and what was being returned." (*See* ECF No. 322, PageID.9201–9202; ECF No. 323, PageID.9471.) These notes were ultimately used to produce a report "based on those three days of the visits." (ECF No. 323, PageID.9471.)

In sum, Petitioner does not demonstrate any *Strickland* violation in connection with any notes or photographs taken by his former counsel during the review of documents at the HHS OIG field office in July 2014. Further, because Petitioner's assertions regarding the contents of his former attorneys' notes and photographs are contradicted by the record or otherwise inherently incredible, there is no need to hold an evidentiary hearing to resolve Petitioner's claims regarding what such evidence would have shown. *See Arredondo*, 178 F.3d at 782 (explaining that a

court need not hold an evidentiary hearing where the petitioner's assertions "cannot be accepted as true because they are contradicted by the record [or] inherently incredible").

*ii.* *Evidence Regarding Alternative Sources of the Documents That Were Seized from Petitioner's Cell*

Petitioner next faults his trial counsel for allegedly failing to retain and present photographs that his trial counsel (Mr. Minock) allegedly took of "complaint folders" located at the 850 S. Hewitt office that allegedly "previously contained the original files that Mr. Ghuman [one of Petitioner's former attorneys] brought to me." (ECF No. 434-1, PageID.12591; *see also* ECF No. 434, PageID.12555–12557.) Petitioner appears to believe that photographs of these "complaint folders" would "demonstrate that the original medical records were given to [Petitioner] and photocopies were left behind in the complaint folders." (ECF No. 434-1, PageID.12591.) Petitioner asserts that Mr. Minock (his trial counsel) "told [Petitioner] that he lost the memory card on which those photographs were saved" and thus "was unable to use those photographs at trial to prove that the allegedly stolen files were leftover files that Mr. Ghuman brought to me from the 850 S. Hewitt office." (*Id.*)

This argument does not help Petitioner. Petitioner has not explained how alleged photographs depicting photocopies would create reasonable doubt by permitting the jury to infer that original patient files that were seized from his cell in July 2014 were not stolen by Petitioner and were instead original patient files that were left in his business office following the FBI's 2011 search. Among other things, Petitioner nowhere explains how the jury could discern from these alleged photographs that the documents depicted therein were photocopies rather than originals. And even if it were apparent that the photographs depicted photocopies, it is unclear how this would create reasonable doubt in the minds of the members of the jury as to whether Petitioner stole documents from the HHS OIG field office.[7]

Such photographs, moreover, would need to be considered in conjunction with the testimony offered by the attorney (Abdul Ghuman) who Petitioner identifies as the source of the documents that were seized from his cell. Mr. Ghuman—who was called by the Petitioner's defense

[7] Petitioner's defense team may have also faced issues in authenticating such photographs so that they could be admitted into the trial record given that they were allegedly taken by one of Petitioner's trial attorneys. Michigan's ethical standards generally prohibit attorneys from simultaneously serving as both advocates and "necessary" witnesses at the same trial. *See* Mich. R. Prof'l Conduct 3.7.

team—testified that he took documents (including some originals) from Petitioner's office and provided some of these documents to Petitioner while Petitioner was incarcerated in 2014. (ECF No. 324, PageID.9739–9740.) He twice denied keeping copies of the documents that he provided to Petitioner (*id.* at PageID.9740–9741), thus raising a question as to the source of the alleged photocopies that would allegedly appear in photographs taken by Mr. Minock. Further, Mr. Ghuman was specifically asked by Petitioner's trial counsel whether he was able to recall whether a set of documents that counsel emailed to him prior to trial "were the ones that you had provided to Mr. Mehmood." (*Id.* at PageID.9741.) Mr. Ghuman responded: "I cannot say yes or no." (*Id.*) Although the documents attached to this email were not further described or identified by counsel or by Mr. Ghuman, one can safely assume that they were the documents that federal agents seized from Petitioner's cell in July 2014, particularly given that counsel did not ask Mr. Ghuman whether he had provided Petitioner with the documents that had been seized from Petitioner's cell (i.e., Exhibits 350A through G).

In light of the weight of the evidence supporting Petitioner's conviction for obstructing justice, the Court finds no reasonable

probability that the alleged photographs described in Petitioner's declaration would have made any difference to the outcome of his trial for obstructing justice, and finds no basis to find counsel ineffective based on the fact that such photographs were not ultimately introduced into evidence at trial.

*iii.* *<u>Forensic Comparison of Different Versions of the Janie Drake Patient File (Exhibits 350A, 351, and 352)</u>*

Petitioner finally argues that his trial counsel was ineffective in failing to engage an expert prior to trial to conduct a forensic comparison of three versions of the "Janie Drake" patient file that the government later used to prove its obstruction case. The three documents in question are: (1) a PDF that the government claimed was scanned from the original "Janie Drake" patient file prior to Petitioner's on-site visit in July 2014 (Exhibit 351); (2) a PDF that the government characterized as a scanned copy of what remained in the Janie Drake patient file after Petitioner's on-site review (Exhibit 352); and (3) pages forming part of the Janie Drake patient file that FBI agents recovered from Petitioner's cell shortly after his visit to the HHS OIG field office (Exhibit 350A). (*See* ECF No. 434, PageID.12557–12563; ECF No. 434-1, PageID.12591–12592; ECF No. 445, PageID.12735–12738.) Petitioner appears to believe

that such a comparison would have equipped his counsel to "prove" that Petitioner did not steal the pages of the Janie Drake patient file that he was accused of stealing, apparently because he believes these analyses would have demonstrated that the documents found in his cell (Exhibit 350A) did not come from the copy of the Janie Drake patient file that he allegedly reviewed on-site at the HHS OIG field office.

This basis for claiming ineffective assistance fails because Petitioner was not prejudiced by any failure by his counsel to secure a forensic analysis of Exhibits 351, 352, and 350A prior to trial. Petitioner ultimately obtained forensic analyses of the documents in question and submitted them with his § 2255 petition. (*See* ECF No. 434-1, PageID.12605–12671.) After reviewing these analyses carefully, the Court concludes that it is not reasonably likely that the outcome of trial on the obstruction charges would have been different had Petitioner's counsel obtained such analyses prior to trial and introduced them into evidence. The analyses provide insufficient support for Petitioner's theory that the pages from the Janie Drake patient file that were retrieved from his cell (i.e., Exhibit 350A) came from a source other than the complete Janie Drake patient file that he and his lawyers allegedly

reviewed at the HHS OIG field office in July 2014. Most of the differences detected by comparing Exhibit 351 to Exhibits 352 and 350A are minor and can be easily explained by the fact that Exhibits 352 and 350A were (1) scanned or otherwise preserved at a later time than Exhibit 351 and (2) scanned or otherwise preserved after being handled by Petitioner and/or his defense team and, in the case of Exhibit 350A, removed from the HHS field office and brought to Petitioner's cell. It is thus not particularly probative that, for instance, Post-It notes may appear in different locations on Exhibit 350A than they appear in Exhibit 351. (*See, e.g.*, ECF No. 434-1, PageID.12670 (entry comparing page 351.0002 to 350A-0001).) Similarly, because Exhibit 351 was scanned before the original pages comprising Exhibit 350A were provided to Petitioner to review, it is not surprising or probative that pages in Exhibit 350A show evidence of staple marks that do not appear in corresponding pages of Exhibit 351. (*See, e.g.*, *id.* (entry comparing page 351.0003 to 350A-0003).) Other minor differences (e.g., the appearance of vertical and horizontal lines, differences in scan quality, etc.) are easily explained by normal variation between scans performed at different times and

possibly using different equipment.[8] (*See, e.g.*, *id.* (entry comparing page 351.0005 to 350A-0005).) In sum, these minor differences do not suggest that Exhibit 350A came from a different source than the document that was scanned to create Exhibit 351.

Further, Petitioner has not demonstrated a reasonable likelihood that he would have been acquitted on the obstruction counts had his counsel obtained a forensic analysis of exhibits pertaining to the Janie Drake patient file. Even if trial counsel had succeeded in demonstrating that Exhibit 350A was not part of the document that was scanned to create Exhibit 351, Petitioner would still be unable to rebut the credible testimony by multiple federal agents that (1) documents from multiple patient files (not just Janie Drake) were discovered to be missing following Petitioner's visit to the HHS OIG field office and (2) copies of the very documents that were discovered to be missing were later discovered in Petitioner's cell. Petitioner's narrow focus on authentication issues ignores the ample evidence pointing to his guilt.

[8] Petitioner's expert reviewed a copy of Exhibit 350A that had been scanned to a PDF file. (*See* ECF No. 434-1, PageID.12615.) The copy of Exhibit 350A introduced at trial appeared to be an original copy of the file. (*See, e.g.*, ECF No. 323, PageID.9509–9511 (testimony by Special Agent Kyle Albert regarding the features that led him to believe that the pages comprising Exhibit 350A were "originals").)

*See Stojetz v. Ishee*, 892 F.3d 175, 198 (6th Cir. 2018) (holding that a petitioner failed to demonstrate that he was prejudiced by his counsel's alleged failure to interview a potential witness where the "evidence presented at trial establishing [the petitioner's] direct involvement in the attack was overwhelming, . . . as was the rebuttal evidence that the prosecution could have mustered").

Because the Court concludes that Petitioner was not prejudiced by the fact that his counsel did not secure a forensic analysis of Exhibits 350A, 351, and 352 prior to trial, it need not decide whether the alleged failure to obtain such analyses constituted ineffective assistance of counsel at *Strickland*'s first prong. *See Ross v. United States*, 339 F.3d 483, 495 (6th Cir. 2003) (declining to consider "whether counsel's performance was constitutionally inadequate" once the petitioner failed to establish prejudice under *Strickland*'s second prong) (citing *Watson v. Marshall*, 784 F.2d 722, 726 (6th Cir. 1985)). Further, in the absence of prejudice, the Court need not hold an evidentiary hearing to assess the credibility of Petitioner's claim that he discussed obtaining such a forensic analysis with his counsel prior to trial (*see* ECF No. 434-1, PageID.12591–12592) or to potentially develop evidence regarding

counsel's strategy in this respect. *See Carson*, 88 F.4th at 642 (affirming decision not to hold an evidentiary hearing where a *Strickland* claim would fail on prejudice grounds even if the petitioner were able to establish that counsel ignored his request to pursue a plea deal).

In sum, Petitioner's first ground for claiming ineffective assistance of counsel fails.

### B. Lack of Interpreter for a Portion of Trial

Petitioner next argues that his trial counsel were ineffective because they (i) failed to object to the Court's decision to proceed without an interpreter and (ii) purported to waive Petitioner's right to an interpreter without ensuring that the procedural requirements of the Court Interpreters Act (28 U.S.C. § 1827) were followed. (*See* ECF No. 434, PageID.12563–12568.)

These arguments fail because, even if Petitioner were correct that he received ineffective assistance with respect to the waiver of his right to the assistance of an interpreter, Petitioner does not demonstrate that he was prejudiced by the absence of an interpreter during the latter part of his trial. While his petition asserts that, "[a]bsent an interpreter, Petitioner was unable to fully understand the trial proceedings and

effectively communicate with counsel to assist in his defense" (ECF No. 434, PageID.12540), Petitioner's accompanying declaration (ECF No. 434-1, PageID.12588–12595) nowhere states that he struggled to understand any aspect of his trial and also nowhere states that the absence of an interpreter prevented him from communicating effectively with his trial counsel. Similarly, although the petition asserts that "technical terms and phrases used at trial were challenging for a native English speaker" and a "non-native speaker certainly would have a problem understanding them" (ECF No. 434, PageID.12566), the petition cites no evidence from the trial record to back up either claim. In general, Petitioner fails to identify any aspect of his trial that was affected by the absence of an interpreter.[9] He therefore fails to establish a reasonable likelihood that the outcome of his trial would have been different had he been provided with an interpreter for the entire trial. And because the Court finds no prejudice, it need not determine whether Petitioner has

[9] The Sixth Circuit made a similar finding when concluding that Petitioner failed to demonstrate that the absence of an interpreter constituted plain error as part of its review of Petitioner's direct appeal. *See Mehmood I*, 742 F. App'x at 932–34. The Sixth Circuit noted that "there is no evidence in the record that the absence of an interpreter affected Mehmood's understanding of the proceedings" and further observed that "[o]n appeal, Mehmood does not point to any difficulties communicating with his counsel or inability to understand the proceedings." *Id.* at 934.

demonstrated that the representation he received in connection with the interpreter issue constituted ineffective assistance under *Strickland*'s first prong. *See Ross*, 339 F.3d at 495.

In sum, Petitioner's second ground for claiming ineffective assistance of counsel fails.

### C. Calculation of Loss Amount at Sentencing

Petitioner next argues that he received ineffective assistance of counsel in connection with his 2019 re-sentencing because his counsel (i) argued that the government had not met its burden of establishing fraudulent billings despite the Sixth Circuit purportedly making it clear that the government had no such burden and (ii) failed to adequately investigate and present evidence of legitimate billings that could have potentially decreased the loss amount used to calculate Petitioner's offense level under the federal sentencing guidelines. (ECF No. 434, PageID.12568–12571.) Neither argument provides a basis to find counsel constitutionally ineffective under *Strickland*.

Both of Petitioner's arguments concern the Court's application of a sentencing enhancement for fraud under § 2B1.1(b)(1) of the 2011 federal

sentencing guidelines.[10] Section 2B1.1(b)(1) directs courts to adjust defendants' offense levels for crimes involving fraud based on the amount of loss involved in their offenses. As set forth above, at Petitioner's first sentencing, the Court accepted the government's argument that it could treat every claim that Petitioner submitted to Medicare as illegitimate (and thus part of the "loss" for purposes of § 2B1.1(b)(1)) because Medicare would not have paid any of Petitioner's claims had it been aware of his scheme to defraud the government from the outset. (ECF No. 279, PageID.5163–5164.) The Sixth Circuit disagreed with this approach to computing loss and therefore remanded the case for re-sentencing. *See Mehmood I*, 742 F. App'x at 940–41. It cited guidelines commentary stating that the "aggregate dollar amount of *fraudulent* bills . . . shall constitute prima facie evidence of the amount of the intended loss." *Id.* at 941 (quoting U.S.S.G. § 2B1.1, cmt. 3(F)(viii)) (emphasis added by Sixth Circuit). The Sixth Circuit noted that "testimony from multiple therapists, nurses, and counselors regarding legitimate medical

[10] Petitioner was sentenced under the version of the sentencing guidelines that went into effect on November 1, 2011. (*See, e.g.*, ECF No. 417, PageID.12253.) The Sixth Circuit affirmed the use of the 2011 guidelines when addressing Petitioner's argument on his first direct appeal that the use of these guidelines constituted an ex post facto violation. *See Mehmood I*, 742 F. App'x at 941–43.

services rendered to home-bound patients" had been presented at trial and yet was not considered under the Court's methodology. *Id.*

At the resentencing hearing in 2019, Petitioner's counsel asserted that the "Sixth Circuit ruling is fairly clear that first the government must show that each company was completely fraudulent or . . . the percentage of which was fraudulent." (ECF No. 417, PageID.12249.) He continued: "When the government comes forward with the amount of fraudulent billings, then we can start picking that apart. They haven't done it." (*Id.*; *see also id.* at PageID.12249 (arguing that the burden did not shift to the defendant to rebut the government's computation "because there is nothing to rebut").) Counsel also questioned the government's ability to prove substantial fraud, noting that the government "spent many, many hours investigating these companies, and the number of fraudulent claims they came up with were 11. . . . That is 11 out of approximately 6,000. That is far, far less than one percent." (ECF No. 423, PageID.12323.)

Petitioner now criticizes this approach, arguing that "counsel erroneously maintained that it was the government's burden to establish fraudulent billings even though the Sixth Circuit made it clear that it

was Petitioner's burden to establish legitimate billings." (ECF No. 434, PageID.12570.) This argument mischaracterizes the Sixth Circuit's decision in *Mehmood I*. The Sixth Circuit vacated the sentence that the Court initially imposed based on its disagreement with the Court's reliance on fraud in the certification process. *See* 742 F. App'x at 940–41. The Sixth Circuit nowhere stated that the Court could simply assume that all billings were fraudulent. It was reasonable for counsel to argue on remand that the government failed to carry its burden of establishing that every billing was prima facie fraudulent, particularly when the alternative was simply accepting that the government had met that burden. The fact that the Court ultimately disagreed with counsel as to whether the government had carried its burden (ECF No. 423, PageID.12344) does not demonstrate that counsel was ineffective in raising this argument in the first place.

Petitioner is also incorrect in characterizing his counsel as having "failed to introduced evidence of legitimate billings." (ECF No. 434, PageID.12570.) As part of Petitioner's re-sentencing, his counsel called seven witnesses to testify about their work for Petitioner's companies between 2006 and 2011 to establish that the companies provided

legitimate medical services during this period. (*See* ECF No. 417, PageID.12198–12237; ECF No. 423, PageID.12281–12305.) Counsel also highlighted the extent to which witnesses at trial testified to providing legitimate medical services while employed by Petitioner's companies. (*See* ECF No. 413, PageID.12113–12115; ECF No. 423; PageID.12368–12370.) The Court relied on evidence developed by Petitioner's counsel and by the defense team at trial in reaching its decision to treat 20% of Petitioner's Medicare billings as legitimate. (*See* ECF No. 423, PageID.12362–12365, PageID.12368–12370, PageID.12366–12367.)

Despite counsel securing this 20% reduction in the loss amount, Petitioner now argues that counsel failed to sufficiently investigate and present evidence that Petitioner believes would have shown that his "companies engaged in numerous legitimate services that would have lowered the loss amount and loss level." (ECF No. 434, PageID.12540.) The petition asserts that "[n]umerous documents were available from which counsel could have established legitimate billings, including: medical records, patient survey reports, Community Health Accreditation Program surveys, Professional Advisory Committee minutes, Governing Body minutes, monthly staff meeting minutes, and

other documents which had been seized by the FBI." (*Id.* at PageID.12570.) Petitioner argues that counsel "failed to obtain these documents and establish the legitimate services that should have been deducted." (*Id.*)

This argument fails to establish that Petitioner received ineffective assistance of counsel. Despite arguing as a general matter that additional information regarding billing for legitimate services was available and could have been discovered and introduced at his re-sentencing (*see id.*), Petitioner does not point to any specific evidence that would have shown that more than 20% of the claims he submitted to Medicare were legitimate. And even if such evidence had been located and introduced, it is unlikely to have lowered Petitioner's sentence. In re-computing the guidelines range applicable to Petitioner's sentence, the Court increased Petitioner's offense level by 22 points based on its conclusion that Petitioner's fraud resulted in a loss that was greater than $20 million but less than $50 million—specifically, a loss of $40,606,612. (ECF No. 423, PageID.12320, PageID.12375.) *See also* U.S.S.G. § 2B1.1(b)(1)(L) (2011 amdt.). The next step down (an increase of 20 points) applied to losses greater than $7 million but less than $20 million. *See* U.S.S.G.

§ 2B1.1(b)(1)(K) (2011 amdt.). Applying this smaller enhancement would have resulted in an offense level of 40 and an advisory guidelines range of 292 to 365 months. *See* U.S.S.G. Sentencing Table (2011 amdt.). At resentencing, the Court explained that the 300-month sentence was justified by the evidence presented at trial and the § 3553(a) factors considered at all sentencing hearings. (*See* ECF No. 423, PageID.12374–12382.)

In sum, Petitioner does not establish that he received ineffective representation with respect to the Court's application of the § 2B1.1(b)(1) fraud enhancement under the federal sentencing guidelines. Petitioner's third ineffective-assistance argument therefore fails.

### D. Potential Witness Regarding Office Set-Up in 2011

Petitioner next argues that his counsel was ineffective in failing to call Mian Khurram to testify at trial or at Petitioner's 2019 re-sentencing regarding his role in allegedly helping Petitioner to set up his business office prior to the government's execution of a search warrant in November 2011. (ECF No. 434, PageID.12571–12577; *see also* ECF No. 434-1, PageID.12593–12595.) For the reasons set forth below, the Court

finds that the decision not to put forward testimony by Khurram did not constitute ineffective assistance of counsel.

Petitioner and Khurram both submit declarations in which they aver that Khurram was responsible for setting up aspects of the office that are depicted in photographs taken during the search of the premises in 2011. (*See* ECF No. 434-1, PageID.12593–12595, PageID.12598–12599.) These features included labels noting which telephone line was assigned to each company, a white board listing various certification-related tasks for each company, and stamps and checkbooks pertaining to each company. (*See id.*) During Petitioner's re-sentencing in 2019, the Court found that such features supported its conclusion that Petitioner continued to operate his home healthcare businesses for fraudulent purposes through 2011. (*See* ECF No. 417, PageID.12252–12253.)

Petitioner appears to believe that Khurram could have provided innocent explanations for the aspects of the office set-up cited by the Court. (*See* ECF No. 434, PageID.12575–12577.) Khurram's declaration asserts he founded a home healthcare business with Petitioner's brother in "late 2008" after completing his ten-year enlistment with the United States Navy. (ECF No. 434-1, PageID.12597.) As part of setting up this

business, Khurram claims to have arranged for the business's calls to be forwarded to the S. Hewitt Road location "to avoid missing important calls." (*Id.* at PageID.12598.) He further asserts that he created a system for using a whiteboard to track important tasks and timelines for his own home health agencies. (*See id.*) Petitioner allegedly asked Khurram to create a similar process for Petitioner's companies. (*See id.* at PageID.12599.) Khurram also asserts that "[c]heckbooks and stamps" were stored at this location because it was "where the accountant worked and carried out all the necessary paperwork." (*Id.*)

Petitioner suggests that the omission of Khurram's testimony proved prejudicial because "the government presented no fraudulent billings beyond 2009" and thus, in Petitioner's view, "the photographs were essential to the [C]ourt's finding that the fraud persisted until November 2011." (ECF No. 434, PageID.12574–12575.) This argument rests on a cramped view of the evidence supporting the Court's conclusion that the conspiracy to defraud the government continued until Defendant's arrest in 2011. As part of Petitioner's re-sentencing in 2019, the Court cited "overwhelming testimony . . . that the purpose of these home healthcare agencies was fraudulent from the beginning, and it was

beautifully executed over an extended period of time, until the FBI or HHS OIC's [sic] office raided the operation." (ECF No. 423, PageID.12344.) The Court provided a lengthy explanation of why it found the fraud to be pervasive and continuous as part of explaining why it would treat the entire amount of Medicare billings submitted between 2006 and 2011 as prima facie fraudulent. (*See id.* at PageID.12337–12370.) The Court did not, in other words, rely on photographs alone to determine that the fraud continued beyond 2009 and through 2011. In any event, Khurram's proffered testimony does not dispel the Court's concerns regarding the appearance of Petitioner's business office or convince the Court that the office was not being used by Petitioner to carry out his conspiracy to defraud the government.

In light of the foregoing, the Court finds that Petitioner received effective assistance of counsel despite the fact that Khurram was not called to testify at Petitioner's trial or in connection with his sentencing. Testimony about office set-up from an individual who did not work directly for Petitioner's companies would not have swayed the Court's determination that Petitioner and co-conspirators continued to defraud the government through 2011. In lieu of calling Khurram, it was

objectively reasonable for Petitioner's counsel to focus on locating and presenting testimony from witnesses who had worked for Petitioner's companies and who could thus potentially testify that the companies provided legitimate services that would offset the loss amount. (*See, e.g.*, ECF No. 417, PageID.12198–12237; ECF No. 423, PageID.12281–12305.)

In sum, the Court finds no merit to Petitioner's argument that he received ineffective assistance of counsel due to a failure to introduce testimony by Mian Khurram regarding his role in organizing aspects of Petitioner's business office that are reflected in photographs taken during a search of the premises in November 2011.

**E. Section 3553(a) Factors**

Petitioner's final argument is that his counsel was ineffective in failing to present what Petitioner describes as "mitigating" evidence that may have justified a different sentence under 18 U.S.C. § 3553(a). This argument fails because Petitioner has not identified any mitigating evidence that Petitioner's counsel failed to locate and raise.

Petitioner asserts that the "Bureau of Prisons offers multiple programming activities to aid in Petitioner's rehabilitation," and criticizes his counsel at his 2019 re-sentencing for not emphasizing this

fact in his presentation to the Court. (ECF No. 434, PageID.12540.) But Petitioner nowhere explains how the existence of programming that may "aid in . . . rehabilitation" merited a shorter sentence than what the Court was otherwise inclined to hand down based on the evidence.

Petitioner also argues that he "had a very good disciplinary record even years of incarceration leading up to sentencing" but his sentencing counsel "failed to investigate and present to the Court this mitigating evidence." (ECF No. 434, PageID.12540–12541.) As the government notes in its response, this argument ignores the fact that a jury found Petitioner guilty of obstructing justice during the period in which he was incarcerated prior to his trial. (*See* ECF No. 442, PageID.12725.) In any event, Petitioner does not explain how his record of good behavior would warrant a lower sentence under the § 3553(a) factors than the below-guidelines sentence that he received.

In sum, the Court rejects Petitioner's argument that he received ineffective assistance of counsel with respect to the § 3553(a) sentencing factors.

## V. Conclusion

For the reasons set forth above, the Court DENIES Petitioner's motion under 28 U.S.C. § 2255 to vacate his sentence. (ECF No. 434.)

There can be no appeal from a final order in a § 2255 proceeding unless the defendant obtains a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1)(B); Fed. R. App. P. 22(b). "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." R. Governing § 2255 Proceedings 11(a). A court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Petitioner does not make this showing. Accordingly, the Court DENIES a certificate of appealability.

IT IS SO ORDERED.

Dated: September 22, 2026
Ann Arbor, Michigan

s/Judith E. Levy
JUDITH E. LEVY
United States District Judge

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or first-class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 22, 2026.

s/William Barkholz
WILLIAM BARKHOLZ
Case Manager